May it please the Court, Dustin Paschal for Appellant, Petroplex Pipe and Construction, Inc. The issue before the Court today is whether, as a matter of economic reality, the appellees were effectively in business for themselves such that appellant properly classified them as independent contractors. And while this Court has made clear that for Fair Labor Standards Act classification cases, it's a very fact-intensive and fact-dependent examination, we believe these guys are making about somewhere around $250,000 a year? Yes, your Honor. It is, your honor. How many clearly erroneous findings do you say that Judge Counts made here? I don't know that I that I tallied up that list, your Honor. Well, give us an estimate. It sounds like you're coming down pretty hard on his factual findings, as you have to, to prevail. Yes, your Honor. Yes, I mean, I think there are multiple clearly erroneous findings in each of the five elements that are in U.S. v. Silk. I kind of go through them as I get to those. Like I said, I haven't tallied those, but I think it's at least a handful of clearly erroneous findings under each element that we go through, your Honor. Well, sometimes appellants make the mistake of going after too many things because it really sort of questions the competency of the judge. And here we have a judge who was a magistrate judge for many years and a district judge for a while. And so why don't you highlight for us the two or three or some very small number that we might want to look at rather than just assuming that for some reason this district judge just had no idea what was going on and made a laundry list of mistakes. Yes, your Honor. And that's precisely what I was going to do. I feel like the main issue that was discussed, it was discussed by Judge Counts the most in his findings of fact and conclusions of law, was the issue of control and whether the appellant controlled the work that the appellees were doing or whether the appellees controlled that work. And one of the clearly erroneous findings here is we believe this issue that the control, at least as appellees laid out in the trial and as Judge Counts laid out in his findings of fact and conclusions of law, is this control flowed from one of the welders named Sam Hardcastle. And the issue that we have there is there was never a finding using those USV silk factors as to whether or not Mr. Hardcastle was an employee of Appellant Petroplex. The record reflects that at least when Petroplex, the appellant first went to hire welders because they had not used those individuals before and their client, Pioneer, asked them to come in and use those. But when they first hired them, they brought on Mr. Hardcastle and one of the appellees, Joseph Hobbs, at the same time. And those two individuals were kind of the initial welders. And then over time they added a few more welders and I think the record reflects that on average it was anywhere from five to six welders at any given time. Mr. Hardcastle eventually kind of moved through the ranks and was doing less welding. Well, Mr. Hardcastle testified that essentially Pioneer started contacting him directly just because Petroplex didn't have that knowledgeability. And so Mr. Hardcastle was kind of passing on to the welders, hey, this is when Pioneer says they need us at the job site. This is the start time. This is the end time. You can be there whenever, but this is when the site opens because Pioneer controlled the site. And so the other piece there is that there was this emphasis on Mr. Hardcastle providing these drawings. When, in essence, Mr. Hardcastle testified Pioneer was providing the drawings. What he was doing was providing a more simplified version to make things a little bit more efficient. But he also testified other welders did that as well. He wasn't the only one. And so this idea that Mr. Hardcastle or that Petroplex, via Mr. Hardcastle, was exerting some control over the appellees, we find to be clearly erroneous. They were in doing the job in the manner that they felt they could do it best. They were told the end project to complete by Pioneer. If there was some efficiency that Mr. Hardcastle was doing, that's clearly what it was. He testified he never had any supervisory authority from Petroplex. No one told him. One of the things that seems to run counter to the argument that you're making is that they were assigned different tasks when the welding was slack. And if they were independent contractors to do welding, it seems to me that that is terribly inconsistent with independent contract theory. They can assign them to other tasks. Well, and that's, I guess, one of the erroneous findings that we would note is we're dealing, at least in this case, with there were three plaintiffs. One, because of the statute of limitations, really has no recovery, so we focused on Mr. Hobbs and Mr. Feeney. Mr. Feeney testified that he never was sent to the maintenance yard. He never did any work at the shop. If he wasn't doing pipe welding on site at Pioneer's jobs, then he wasn't doing anything. Now, he might be doing some maintenance type of pipe welding on Pioneer job sites, but he testified he never went to the maintenance yard, never went to Petroplex's shop. Mr. Hobbs testified he went to the maintenance shop one or two times. He was directed to go to the maintenance shop to perform tasks other than welding. Is that correct? It's not that he was directed to do so. It's that there was, as Your Honor pointed out, a slowdown in a particular job, and so to provide Mr. Hobbs with something to do, he was given the opportunity to go to the shop to do that. He was not directed to do so, which is why Mr. Feeney never went, because Mr. Feeney wasn't directed. Mr. Feeney just chose not to. That was a choice that Mr. Hobbs chose. Rather than to go find another oil services contractor to work for to fill that gap, he chose to stay at Petroplex and go do that one or two times as opposed to completing the pipe welding. Part of what plays into that control is— All of that has to do with an employee, though. I mean they don't work for anybody else. They're working 70 hours a week or something like that. They don't have time to contract with anybody else to do work other than to work for this one particular person or one particular company. They don't sound like independent contractors to me. Well, I think, Your Honor, the issue is, yes, while the work was going on, they may not have had—I would concede that there was likely not a lot of time in any given day while they were— One of them worked for three years, another worked for more than six months. Correct. How many people were doing the same work that they were doing? On average, annually, I believe T.R. Bridges, the president of Hobbs, satisfied he had five to six welders at any given point. Were all of them treated as independent contractors or some as employees or what? They were all treated as independent contractors. Petroplex employed as employees about 150 individuals because they have a hot oil business and then they have their roustabouts. So they have 150 employees. The only independent contractors they had were these welders because that was about 5 percent of their business. It was nothing they had done prior to 2014. So they brought them on. Did they sign contracts with any of them? They did not have signed contracts with the individuals. But I will note to Your Honor's point a few moments ago, while they may not have had the time during a specific job that they were working for Petroplex, there is evidence in the record that they had the ability to choose and work for other individuals. In fact, Mr. Feeney worked for Petroplex for six months and then left, the whole point being he wanted to find a contractor closer to home because he did not live in the Midland area. He wanted to work less because Petroplex had quite a bit of work. He was gone for a nearly two-year period. They came back for six months. Mr. Hobbs took five weeks off because his welding truck wasn't working and Petroplex did not provide that type of equipment. So he took five weeks not to work, ultimately elected to incur the cost of $180 a day to rent a welding truck so he could begin providing services to Petroplex again. So while there may not have been that time in the day, you're correct, there were some times where they were working anywhere from 50, 60, 70 hours a week, according to the Appleese testimony. They had the choice in the election to work for other contractors if they so chose based on the price that they were paying, and Mr. Feeney testified. That's kind of the nature of what he did was he traveled around the country finding the vendors that he could work for that paid the best or had the best jobs going on, and it was known that Petroplex was good because they had consistent business with Pioneer. And so within the kind of welder community, they knew we can always find work if we go to Petroplex, which is why Mr. Feeney came back. And while there are some indicia that make it sound like an employee relationship, we believe this is very similar to the Parrish case that this court just decided earlier this year in February. I mean, in that case— Where was the district court clearly erroneous? It seems to me, I mean, that what we're talking about really is a legal issue here and supported by certain factual historical facts, and I don't see—what is the dispute here, the factual dispute? Well, as this court did in the Brock v. Mr. W. fireworks case, it is a clearly erroneous standard for the facts, the underlying facts and the factual inferences. But a de novo review— So how was the district court clearly erroneous on what facts that are relevant here? And, Your Honor, we've outlined that in our brief, the various facts that were clearly erroneous. But, again, we think one of those may be that, you know, there's—the district court found that the Appleys could not refuse work and that they were disciplined for being late to work. Was there evidence of that? Well, and that's my point. The evidence that we have is it was a hypothetical on the Appleys' part. What was the evidence of it? That's the question. Evidence of them refusing work, Your Honor? Yes. Yes. Mr. Bridges, the president— What happened to them when they refused work? Mr. Bridges testified in the trial that Mr. Hobbs, one of the Appleys, refused a project and he suffered no consequences. Mr. Bridges simply found someone else to do that project, and Mr. Hobbs remained a contractor and continued to perform work for Petroplex. What did Hobbs say about that? Hobbs obviously denies that he— You have two different stories. That's the fact finder's job. Correct. Which story is more credible? Correct, Your Honor. The point we would make, though, is if you look to the Brock v. Mr. W. fireworks, it was exactly the same thing. There was testimony from one side, testimony from the other. And what the court pointed out there is that the district judge made no credibility determinations. There were no overt credibility determinations that this witness was less believable than this witness. And the court—this court in the Brock case went through and said this is evidence that was presented that should be considered when deciding those elements. And that's what we're asking this court to stick with today is there is evidence there to support that claim. And the argument that you are making, I mean, you haven't convinced me yet that there's not evidence on both sides and that ultimately it was for the district court to make the decision overall about whether the underlying facts supported the legal conclusion that they were independent contractors or not. Your Honor, I will concede to you that there are facts on both sides. I think that's the nature of these cases is there are facts on both sides. And, yes, while the district court had, as the fact finder, had the job to make those determinations, again, I would just direct to the Brock case where same situation. It was a bench trial where the judge was the one making those factual determinations. And in that case, they still went through and determined there were some things that the judge didn't consider that should have been considered when making a determination of that independent contractor employee classification. There were some things that the judge relied on too heavily that should not have been relied on too heavily. The appellate court went through in that de novo review. Related to what Judge Smith asked you at the outset, I mean, what are the primary errors that the district court made? Just name three that were determinative of your case. Sure. As I said, I believe one is that they could not refuse work when there is evidence that they could refuse work and did refuse work. And then another being… You've got one incident of their refusing work. Correct. And generally, I mean, the district court looked and says, look, these people are required to stay there all the day. I mean, some of them were told that they could not be absent from work. Some of them were, I think they were exposed and were reprimanded for being tardy, that sort of thing. I mean, there's evidence on both sides. The testimony regarding the tardiness, that kind of goes to another clearly erroneous finding in that judge counts in the findings of fact and conclusions of law. One of the findings was that Mr. Hobbs was terminated for arriving late. Mr. Hobbs actually testified that that's not the case. Mr. Hobbs stopped working for Petroplex because he and Mr. Hardcastle got into an argument about Mr. Hobbs' attitude. And as a result, Mr. Hardcastle said I just can't use you anymore. And that's the reasoning that Mr. Hobbs no longer worked there. It wasn't because of tardiness. I can't use you anymore. He didn't say your contract is broken. That is correct, Your Honor. Yes. And the idea being that, yes, the idea being on the tardiness, it wasn't so much disciplined. They did not get disciplined for arriving late. It's just that they were sent home. They couldn't work. And essentially what it was is it's similar to the Parrish case where in Parrish the workers were found to be independent contractors even though they were told where to report, when to report, and had to get permission to leave the job site. Even with that, this court said they were independent contractors because they still controlled. Judge Smith said earlier, and that is you've got to get something that gets our attention. And you spread this thing out over a spreadsheet and nitpick it, then we don't—we're not impressed with the fact that the district court was incorrect. Where is your sockdology? Where did the district court actually make a mistake that requires us to rule for you? Well, Your Honor, and maybe I'm not expressing it as well as I think I am, but I think the issue is in that control piece. The issue was that those findings that they couldn't refuse projects, that's not true. There is evidence from Mr. Bridges that Mr. Hobbs did in fact refuse a project and suffered no repercussions. There is in fact evidence that Mr. Hobbs left for five weeks. That's refusing—he's not working projects when he's gone for five weeks. Mr. Feeney left for two weeks. Well, you've shown little—the way it comes across to me is you've shown little exceptions to general pattern, that the district court could have concluded that all you did was show exceptions to the general pattern of conduct. And my time has expired, but I'd like to respond to Your Honor if you'd like. Well, you can do that on rebuttal. Okay. I mean, you can take 30 seconds now to do it if you want to. I just—I think when you reference exceptions, I think to my point, like I said, I think there are facts on both sides. That's the nature of all of these cases. What we're—the idea is in these cases we want to give some sort of guideline for future employers so they can figure out how to properly classify and strive to comply with the law. And in a situation where we've got the Parrish case, which we believe has such remarkably similar facts, and that finding was independent contractor, that's where we feel like this court, as this court did in the Brock case and went through piece by piece, element by element, and found that it was an independent contractor type of situation. And I'll yield until my rebuttal, Your Honor. Yes. You've saved your three minutes for rebuttal. Thank you, Mr. Pasternak. Thank you, Your Honor. Milton Berger. May it please the Court, Chris Milton Berger for Joseph Hobbs and Drake Freeney. Judge Smith, as you said, if the workers testified it was day, the company testified it was night. If the company testified it was day, the workers testified it was night. Judge Counts had numerous documents in front of him on summary judgment and said, You guys are on different planets. I need to have a trial to resolve the facts. The factor that was most impressive to me on behalf of the company was the fact that these plaintiffs spent huge amounts of money on what I'll generally call equipment. You know, of course, what I'm talking about. Some of it might go beyond the word equipment, but it just seems to me that it looked like they actually maybe spent more money than the company did, and that normally would be an indication of an independent contractor. Mr. Paschal didn't have time to address that, but I'd like for you to address it. Yes, sir, Your Honor. So they did spend large amounts of money on a truck, and they spent money on a welding machine to go on that truck. But if you look at it, I spent large amounts of money going to law school. Mechanical engineers spent large amounts of money going to engineering school. That's not at all what we're talking about. You know good and well under the FLSA that one of the tests is whether the worker spends a lot of his money on the kinds of equipment and tools and uniforms and those sorts of things that normally one would expect an employer would provide. And took tax advantage for it. Sir? And took tax advantage for those expended to it. Well, there were tax advantages, but if I look at their tax advantages again, one of them was a truck, and normal people can't take their truck off. Others were a camper, and normal people can't take living expenses off. But because Mr. Hobbs was always an employee until he was assigned to be an independent contractor, he was then, his accountant took the expenses off. He didn't take those off prior because he was an employee. The fact of the matter is Judge Counts looked at all these factors, and I will go back to the relative investment. The court does say that you look at relative investment and that's a consideration. However, in the oil field it also looks at it and says you look at it on a job by job. Petroplex on these construction jobs spent much more money than the plaintiffs did here. But again, and I think as the court has said in Parrish, that's really not an overriding factor of the investment. But I think in this case Petroplex spent more on the jobs than the plaintiffs did. Now, they didn't spend more on welding than the plaintiffs did. And the plaintiffs were welders. And the plaintiffs were welders. They were welders on a project where there was a whole group of people working. So essentially what happened here, let's say you had a piece of equipment in this front part of the courtroom and a piece of equipment in the back. Petroplex's client, Pioneer, said we need to get those two pieces welded together, connected. Mr. Hardcastle, who was the de facto supervisor of the group, he took the plans and he drew exactly how to get from up here to back here. So you could have gone down this rail. You could have gone this way. You could have gone that way. But he made the plans and he gave them to the welders and said, okay, here's what you need to do. That's not inconsistent with being an independent contractor. I mean, an independent contractor is hired to do a job at a particular plant, in my mind, and he is told and given instructions about what the principle of the contract wants done and how he wants it done, and the independent contractor does the work. And in this case, they did do the work on a daily basis and they were assigned different jobs each day or every two or three days or whenever they finished, they would report in and they'd be assigned another job. So it's not like they bid for the jobs on a project by project and said, okay, we'll weld this up for you for $2,000. Petroplex testified in the record. They did have some contractors that did that. But in this instance, every day, as I think you questioned earlier, they were assigned a job, do this for us. If they didn't have something to weld that day, they were sent to the shop. They were sent to maintenance products, I mean projects. They were on call. They were called off what they were welding to say, wait a minute, we need you to go over here and weld over here today. Does the record show how often that occurred? That occurred occasionally. Nobody gave a specific number of how often that occurred. But that did occur. Mr. Hobbs testified that he did. When I go back to the questions about, I think Judge Costa, you asked. The higher rate of pay for doing the more menial tasks. They were paid the same no matter what. All of the welders were paid the same regardless of their certification or regardless of what they did. It's the same flat hourly rate for all of them. You raised a question about the money they made. People in the oil field worked long hours. Even the roustabouts are making $150,000 out there. I mean it's the nature of the oil field right now. Judge Costa, you raised the point about is there evidence on both sides? There is. The council kept talking about what Mr. Bridges testified to, but Mr. Hobbs denied that. So there was a credibility determination that had to be made, and Judge Counts made that determination, who he believed, and he put that into his findings of fact. As the court has referenced, the standard is clearly erroneous with regard to the underlying facts and with regard to the facts of whether there's control, investment, skill, initiative, et cetera. In the Brock case specifically, the Fifth Circuit stated, we agree with Mr. W's findings as to control, investment, skill, initiative, opportunity for profit and loss, and permanency are plainly and simply based on inferences from facts, and thus are questions of fact that we may set aside only if clearly erroneous. So again, I go back to what Judge Counts did. I mean Judge Counts held the trial. He made credibility determinations. When they talked about the Brock case, in the Brock case, the question at one point where the Fifth Circuit said, well, that was clearly erroneous, the question was did you always follow the owner's standard retail pricing? Three of the operators said no. Ten of them said yes. The Fifth Circuit looked at it. There was no credibility because three of them were testifying honestly and ten of them were testifying honestly. The Fifth Circuit looked at it and said, well, the ten clearly should rule. The trial judge found that the three should rule. The Fifth Circuit said that was clearly erroneous. With regard to display signs, one of them testified that he altered the display of the fireworks, and six of them testified that we always displayed it like the owner said. Again, the Fifth Circuit, no credibility because they were all telling the truth, but the Fifth Circuit said six to one. That doesn't sound like a finding of fact to me. I mean, that sounds like the legal conclusion drawn from undisputed facts. About whether they had, about whether they followed. Whether you're going to have ten or three. In other words, there's nobody disputing the facts. And that's my point. Here we are disputing the facts. Here almost everything that the employees said, the owners said different, and there were very few undisputed facts. And Judge Counts, that's why he had the trial, had to make a determination about the facts. We cited in detail in our brief support, substantial support in the record, for each of the findings of fact that he made. When he then went to his conclusions of law, he looked at all of the cases that involved. He looked at Robichaux. He looked at Carroll. He looked at Cromwell. He looked at Tybalt. And he looked at Parrish. And he made his conclusions of law based on the findings of fact, based on all of those cases. If there was a point that he needed to differentiate, he differentiated those points. But this isn't a case where he misapplied any law. I mean, he had the law in front of him, and he discussed the law in detail in each of his conclusions of law and findings of fact. What did he say about the fact that they expended significant amounts of money in connection with their work and that they apparently considered themselves independent contractors because they took these tax deductions? He did two things on that, on the amount of money that they spent. He ruled that, as the Fifth Circuit said, especially in Parrish, you look at it on a job basis, not just welding but on this entire job. And he found that the company spent more money than the plaintiffs, but he didn't give that very much weight in his determination because of the nature of the oil field. And the second point was? About the tax. About the taxes. He looked at that, and he said, as the Fifth Circuit said, in numerous cases, the employees, what they consider themselves, is not relevant. Employees can't waive employee status. And just because they filled out their taxes as independent contractors is not controlling making them independent contractors. And, again, I go back to Hobbs. He only filled out his taxes as an independent contractor because the company treated him as an independent contractor. Once the company did that and moved him to an IC status, that is how he had to fill out his tax returns. He didn't have a business set up. He had not worked for anybody as an independent contractor, didn't have cards, didn't have solicit work. He was a welder's helper, and they get paid substantially less than a welder. Because once they classify him as an independent contractor, he has to pay his payroll taxes, both sides of the payroll tax. Exactly. And there is testimony in the record where he says he really doesn't know if he came out ahead or behind, but he gave all his documents to an accountant, and his accountant filled out everything. But once the employer no longer paid, he had to pay self-employment tax, et cetera. And this court has stressed that the findings of facts should not be overturned unless clearly erroneous. I believe that this case falls closer to the Cromwell case than the Parrish case that they're identifying. In Cromwell, the Fifth Circuit looked at the previous cases of Robichaud and Carroll and said that the primary difference is in Cromwell, the employees were given steady and reliable work over a substantial period of time, and they worked only for the same employer, whereas in the Carroll case, it was on again, off again, project by project. Projects lasted one day to—one was only six weeks. The most employee was there was—or the most alleged employee there was only 16 weeks. They were given a detailed plan, and they had to make the plan work. Is there any testimony about the custom in the industry? I mean, it seems like there is some evidence that these highly skilled people kind of go from job to job, you know, get in a truck, go up north in the summertime and come down south in the wintertime maybe and work for different employers and they just check in and check out. Mr. Feeney did testify he went up north, but he went in February. It's the wrong time. He said, I was ready to come back home. No, there was actually—there was actually not testimony about industry practice. Mr. Hobbs testified he'd never been an independent contractor. Mr. Feeney testified that he had worked as an independent contractor before, but there wasn't a standard or— The industry does. There was no standard about how the industry—the basis of the industry employed the same people, the people that had the same skills. There was no testimony about that, and I think the fact that, you know, we've been a long time between lawsuits about welders, you know, shows that the industry is getting along just fine with however they're doing it. If some people are truly employed as an independent contractor on a project-by-project basis for short-term periods of time, then they're independent contractors. Mr. Hobbs worked for them for three years, had no other income from anybody, no other livelihood. All he did was weld for Petroplex for three years. Was there any evidence with respect to the other welders who were also employed as independent contractors? No, sir, there was not. There was only testimony that there were other welders that were not— Well, there was a welder who was treated as an employee, but there was not testimony about what the other independent contractors did, whether they had businesses set up, how long they were there, et cetera. Mr. Hobbs and Mr. Hardcastle were the first two welders, and Mr. Hobbs was there, obviously, the longest period of time. The only time he wasn't there and the only time he wasn't working was one time he took a vacation. He asked him two months in advance if he could take a vacation, and another time his truck broke down. Even when his truck broke down, it came back to him that the company wrote him a letter in his damages against the mechanics saying he missed work during this period of time. Parrish is different than this case because in Parrish, the work was actually assigned by a staffing company. A staffing company in Parrish called up and asked, Do you want this job? And the employee or the alleged employee would say yes or no. The employees, alleged employees in Parrish had businesses set up. One of them had a goat farm set up. They took it. They were free to refuse jobs. They took the jobs on a job-by-job basis. I think in oral argument, although I didn't see it in the record, but in oral argument, the attorney for Premier said that there were several weeks between jobs. They worked for other people. Well, they had the ability to work for other people. I'm not sure if they did in Parrish or not. The real test is, are the alleged employees economically dependent on this employer? In this case, while they worked for them, they were. They worked for no one else. They didn't have time to work for anyone else. Counsel makes a point, well, they could have worked for someone in the brief, but the court has already looked at it and said it's not what they could have done. It's what they actually did, and given the hours that they were working, they really didn't have time to work for anyone else. I mean, as a practical matter, this was their employer. You couldn't tell the difference between them and the other roustabouts on the crew that was working on this project. I remember Mr. Hobbs testified, it's in the record, that he drove a forklift. Petroplex paid for all of their training. Petroplex paid so that they would meet the pioneer specifications. And finally, with regard to Mr. Hardcastle, he kept their daily hours. He even, on one occasion, the record shows that he told Mr. Hobbs, you can't bill five hours today, I'm cutting you down to four hours today. I'm only allowing you to bill four instead of five. Well, they were being paid by the hour, were they not? Yes, they were. So someone needed to keep track of their hours. I don't think that cuts one way or the other. I don't think it does either, but it does to the extent that Mr. Hardcastle was deleting hours from what Mr. Hobbs turned in. Hobbs said, I worked five hours, and Hardcastle said, we're only going to pay you for four. We can only get four hours for this. That's completely consistent with being an independent contractor. You're charging me for five hours, but you only did four hours worth under our agreement, so that's all I'm going to pay you for. Well, I would think an independent contractor would also bid on the job by job and say, here's how much I'm going to charge you for this, and Petroplex did have the concrete company that they had out there. It's in the record. They did have a concrete company that would say, okay, we'll build this concrete pad for $3,000, and it was up to the concrete company to do more or less than try to get in and make a profit off of it. The only way these welders could make more of a profit was work more hours. All right. Anything else? That's all. I'd just emphasize that Judge Counts did go through, and he looked at all the facts, and he made his findings a fact, and they're all supported by evidence in the record.  Thank you, Mr. Melton. Thank you, Your Honor. Mr. Paschal for rebuttal. You've only got three minutes, so you need to focus on your strongest points. Sure, Your Honor. And I think part of the problem is this consistency in the decisions, because Mr. Miltonberger points out that he felt Cromwell was more appropriate here rather than Parrish, but prior to this Court deciding Parrish, Mr. Miltonberger was relying on the district court's decision in Parrish because it was so factually similar. And I think part of what was discussed was this disputed facts versus undisputed facts, and Mr. Miltonberger talked about in the Parrish case there was this three people feeling one way, ten people feeling another way, and there was a discussion also about hypotheticals, and I think what's good for the goose is good for the gander, because in this case, you know, Mr. Hobbs testified when it came to the discipline regarding the control of whether he had to be on the job site, his testimony was that maybe or possibly he would be terminated for missing work. He did not have any evidence that he suffered any repercussions for missing that work. There was no control when it came to the job site. Mr. Hobbs controlled what jobs he wanted to do, when he wanted to work. Pioneer controlled the beginning and ending time for the job site because they controlled, physically controlled the site. It was not property that Petroplex owned or controlled. And much like in Parrish, no appellee testified about any discipline that they suffered regarding their work other than if we didn't arrive on time, we would be sent home. That happened a handful of times. But again, in Parrish, we had the same thing. Those workers could not leave unless they asked for permission. So obviously, you know, it stands to reason if they had to ask permission to leave, they would likely be disciplined if they left without asking for that permission. So we just don't have that here. And I do want to talk about the investment. I mean, there is that whole investment issue in that the appellees had significant investment in their tools and equipment, whereas the only thing that Petroplex was spending money on were the consumables, which they testified Pioneer reimbursed them for, the acetylene gas, some oxygen, the welding rods, maybe some buffing pads, but very small investment. And while appellees want to focus on the entire project, I think the cases in Thiebaud and Parrish said the same thing, and a Trahan case out of the Southern District of Texas, say that you look at the specific job the appellees were performing, and at least in Carroll, it was a pipeline construction, so those pipe welders were, that's the whole job, whereas in this, there was a lot of other activity happening on the job site that wasn't necessarily related to what the appellees were doing. And with that, I'm out of time. Yes, your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.